In the Matter of BENJAMIN A. JAVITS, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, January 5, 1971.

*John G. Bonomi* of counsel for petitioner.

*James H. Halpin* and *Stanley S. Arkin* for respondent.

*Per Curiam.* The respondent was admitted as an attorney by proceedings taken in the Second Department in December of 1922. For many years, he has been engaged in the practice of law in this Department with his son and other partners and associates under the firm name and style of Javits & Javits. In this proceeding instituted by the petition of the Association of the Bar of the City of New York, the charges are that the respondent "has been guilty of attempting to perpetrate a fraud upon the Courts of Mexico and the United States by paying monies to Mexican public officials and another Mexican national in order to improperly obtain and subsequently defend a nullification of a Mexican divorce decree" divorcing Mrs. Lewis S. Rosenstiel from her former husband, Felix Kaufmann. The respondent interposed an answer denying the material facts alleged in the petition in support of the charge and the issues were referred for hearing and report to a Referee. Following the hearing of the allegations and proofs of the parties, the Referee has rendered a report sustaining the charges and his report has been filed with this court. The petitioner now moves to confirm the report and prays that the respondent be severely disciplined.

The findings of fact and the report of the Referee are confirmed. Thereby it is established that the respondent, under a retainer by Mr. Rosenstiel, conducted an investigation and initiated steps leading to a vacatur of the Kaufmann (Mexican)

decree of divorce. The respondent, although not retained by either of the parties to the Kaufmann decree, and acting under a retainer of his client, sought to obtain an unusually expeditious nullification of that decree. In this connection, substantial sums of money were paid to persons who were Mexican nationals, including to an Attorney General of a State in Mexico. The latter, who was allegedly retained as a practicing lawyer, was paid the sum of $10,000 to take proceedings for a vacatur of the Kaufmann decree. The payment, in the form of a bank draft purchased by respondent's firm, was delivered to the Attorney General by a Mexican laywoman who was employed by respondent as a person having some influence in Mexican affairs. About a week after the payment of the retainer to the Attorney General, upon petition of one '' Samuel Goldsmith '', a purported creditor of the Kaufmanns, the Attorney General delivered to respondent's representatives a decree (the Goldsmith decree) rendered by the Mexican court setting aside the Kaufmann divorce decree. The Goldsmith decree was obtained ex parte without notice to Mrs. Rosenstiel other than a posting on the bulletin board of the Mexican court house. Respondent testified that he intended at an appropriate time to surprise her attorneys with the decree; that he would use it in a pending separation action before her attorneys learned of its existence and instituted proceedings to vacate it.

Eventually, Mrs. Rosenstiel did learn of the Goldsmith decree and brought an '' amparo '' proceeding to set it aside. However, fully aware that it had been obtained without notice to her and that it was of questionable validity, the respondent proceeded in disregard of proper ethical standards, to continue to urge the efficacy of the decree. Without authority of '' Goldsmith '', he retained Mexican attorneys to appear in opposition to the amparo proceeding, and also solicited from Mr. Kaufmann a power of attorney authorizing them to appear for him. Incidentally, these attorneys, who appeared in opposition to the amparo proceeding without authority of the alleged original Mr. Goldsmith, purported to appear for a '' second Samuel Goldsmith ''. When Mr. Kaufmann later revoked his power of attorney, the respondent sent a representative to Switzerland to contact him to see whether or not his action in revoking the original power of attorney '' was irrevocable or whether he was still willing to have some representation ''.

The respondent's unethical conduct included the paying out of large sums for the purpose of exerting influence on the part of public officials of Mexico to further the interests of his client. An aggregate of $15,500 was paid to the Attorney General in

connection with his alleged retainer as a private practitioner and as an alleged " associate counsel "; $10,000 was paid to a Mexican laywoman who was friendly to a member of the Mexican cabinet, the payment being made " for public relations, Mexican action, fees and disbursements "; $3,000 was paid as a contribution to a charity in which a member of the Mexican cabinet was interested in order to obtain " a favorite public relations climate "; a hotel bill of about $1,500 was paid to cover the charges of a stay in New York City of that same member of the Mexican cabinet; a sum of $5,000 was expended to obtain powers of attorneys from the attorneys who represented the parties in the Kaufmann divorce action, and also one from Mr. Kaufmann; and substantial sums were paid to the firm of attorneys in Mexico to oppose the amparo proceeding brought by Mrs. Rosenstiel.

The evidence, within the framework of the charges, does establish serious professional misconduct in a course of conduct tending to exert improper personal influence upon the courts, in a lack of candor and fairness with the courts, in fostering unjustified and questionable litigation and defenses, in the improper solicitation of employment, and in general in conduct designed to bring dishonor upon the courts and on the administration of justice (see canons 3, 15, 22, 27, 29, 30, 31 and 32 of the Canons of Professional Ethics).

The respondent's professional misconduct represents serious breaches of the Canons of Professional Ethics and warrants severe discipline as prayed for by the petitioner. However, in fixing the measure of discipline, we have given due consideration to the general standing and good reputation of the respondent at the Bar and in the community, and also to his advanced age, his demonstrated ill health, and his purported retirement from the active practice of the law. Under the circumstances, the respondent should be suspended from practice for a period of three years.

McNALLY, J. (dissenting in part). I dissent, in part, and vote to disbar. The record amply supports the report of the learned Referee, the Hon. George Trosk, in his conclusion that respondent attempted to perpetrate a fraud upon the Governments of Mexico and the United States by paying moneys to Mexican public officials and a Mexican national in order to improperly obtain and subsequently defend a nullification of a Mexican divorce decree.

Respondent's answer to petitioner's charge letter admits the payments to Mexican public officials and a Mexican national

upon which the charge is predicated, but denies any impropriety, contending that he had relied upon a lawyer associate, now dead, familiar with procedures in Mexico, who had approved all aspects of the Mexican litigation. The proof shows that respondent not only acquiesced in the improper activities but participated in many aspects. His failure to conduct any investigation into the circumstances, even when faced with charges that he engineered a fraud, confirms his awareness of the improprieties and his sanction of them. This is further demonstrated by the lack of candor which characterizes his testimony before petitioner's Committee on Grievances, the inconsistent answers he gave when questioned concerning the underlying events, plus his inability to furnish any legitimate explanation for the role played by the various Mexican nationals to whom he made payments on behalf of his client. The fact that respondent relied upon a lawyer associate, now dead, is wholly immaterial, for his acquiescence and participation in the procuring of a fraudulent decree, nullifying the Kaufmann divorce, was improper, whether done in concert with others or alone.

Respondent's client was anxious for results. His own testimony shows the client, Lewis S. Rosenstiel, said in substance that money was no object to get rid of his fourth wife. The respondent testified that Rosenstiel told him "It doesn't make any difference. I will spend five million dollars, ten million dollars, whatever it is. Spend it, get it done."

While an ancillary proceeding called "Amparo" was pending in the federal courts of Mexico, as distinguished from the State courts of Chihuahua, the respondent paid large sums to a Miss Figueroa, a non-lawyer, to be used as a contribution to a charity in which a Miss Ledon, a member of the Mexican cabinet, was interested. This in order to obtain a so-called favorable public relations climate on behalf of his client. This sum was ultimately charged to the client as a disbursement in the Mexican action. Thereafter respondent paid Miss Ledon's hotel bill at the Hotel St. Regis in New York in a substantial amount which he charged to his client for public relations related to the Mexican litigation. Respondent could give no explanation for these payments and their relation to the Mexican action other than to state that at one time Miss Ledon had given a party at which he had occasion to meet important Mexican officials including many of the Judges in the federal court in which the ancillary proceeding was pending.

The fact that respondent did not physically sign a $10,000 check payable to Chemical Bank New York Trust Company for the purchase of a $10,000 bank draft payable to Jose Luis

Sequerios, then Lieutenant Governor and Attorney General of the State of Chihuahua, is immaterial. The check was signed by one of his partners, named Held, and respondent has repeatedly testified that he authorized the payment of the $10,000 to Sequerios. Since he authorized the payment, all inferences drawn by the Referee from the payment to Sequerios may fairly be imputed to the respondent.

Respondent argues that neither of his legal associates was charged with misconduct. This is wholly immaterial. In a disciplinary proceeding, it is not for the respondent to argue that disciplinary proceedings should have been brought against others. That the two lawyers, one of whom is now dead, were conspirators in acts of professional misconduct, does not redound to the benefit of any one of them if the fellow conspirator was not charged. The question of whether the charges against respondent have been sustained must be based on the record and nothing else.

In addition to the misconduct confirmed by the majority, the Referee found the following and the record establishes the same.

Respondent was of the opinion his client had no basis for a divorce either in New York or Connecticut. Nevertheless, Lewis S. Rosenstiel was adamant — he "couldn't take it any more, and would have to get rid of her (his wife)." Moreover, Rosenstiel was willing to spend five to ten million dollars toward that end. Respondent advised the only possibility was the nullification of Mrs. Rosenstiel's Mexican divorce.

Mrs. Korn, an associate of respondent, was charged with the duty of looking into the Mexican divorce proceedings and render her legal opinion thereon. Between November and February, 1962, Mrs. Korn made trips to Mexico, examining records and consulted various Mexican attorneys. She rendered three reports thereon. The substance was there were possible grounds for vacatur of which Rosenstiel might avail himself. However, the Mexican attorneys were of the opinion that Rosenstiel was required to institute the necessary proceedings, on notice to his wife and her former husband, which would entail at least two years. Respondent conveyed this opinion to his client, who, in the words of the respondent "steamed to the roof".

Mrs. Korn made another trip to Mexico on February 28, 1962. She rendered no written report thereon. Prior thereto, on February 2, 1962, Mrs. Korn wrote to Luis Sequerios, the Attorney General and the Lieutenant Governor of the State of Chihuahua, requesting, on behalf of respondent's firm, that he take the appropriate action indicated by six allegedly jurisdictional irregulari-

ties in respect of the Mexican divorce decree of Mrs. Rosenstiel obtained by her former husband, Felix Kaufmann.

Prior to Mrs. Korn's letter of February 2, 1962, there was presented to the Civil Court of the District of Bravos, City of Juarez, State of Chihuahua, the petition of one Samuel Goldsmith, dated January 31, 1962, purporting to be a creditor of the Kaufmanns, which alleged invalidity of their divorce by reason of failure to publish it in the official newspaper of the State of Chihuahua. After posting of the notice of the Goldsmith proceeding for the period of three days in the courthouse in Juarez, a decree dated February 6, 1962 was made declaring null and void the Kaufmann divorce decree dated October 2, 1954.

Mrs. Korn's trip to Mexico on February 28, 1962 was for the alleged purpose of seeking the aid of Sequerios to attack the Kaufmann divorce decree on the basis of the alleged jurisdictional irregularities. It is indisputable that the Goldsmith decree vacating the divorce decree had previously been entered. Hence, the alleged purpose of Mrs. Korn's meeting with Sequerios had been fully accomplished prior thereto. The assigned reason for the meeting is inconsistent with the indisputable record of the Goldsmith proceeding and, therefore, incredible as a matter of law.

The documentary evidence clearly establishes the purpose of the meeting with Sequerios was to compensate him and a non-lawyer for their improper efforts, covert and off record, in procuring or causing the entry of the Goldsmith decree; it also establishes that Mrs. Korn's alleged letter of February 2, 1962 did not cause the commencement of the Goldsmith proceeding on January 31, 1962.

Mrs. Korn testified she was introduced to Miss Carmen Lopez Figueroa, a Mexican laywoman, associated with Amalia Ledon, a member of the Mexican cabinet, on February 27, 1962. The introduction was made by Mr. Rosenblatt, respondent's co-counsel and office associate. Mrs. Korn was informed Carmen would introduce her to Sequerios. Allegedly unknown to Mrs. Korn was the fact that Carmen had in her possession a bank check dated February 26, 1962, purchased by respondent's firm with his authority, payable to Sequerios. Said check was delivered by Carmen to Sequerios out of the presence of Mrs. Korn. About one week later, Sequerios delivered the Goldsmith decree to Mrs. Korn in Mexico which she brought to the respondent on or about March 8, 1962. At that time, payments in the total sum of $10,000 were made to Carmen. Part was by check for $5,965

payable to Mrs. Korn, dated March 8, 1962, which sum was paid out by her on the order of Carmen.

Other payments made by respondent's firm for the account of Rosenstiel at or about the Goldsmith decree are:

| | |
|---|---|
| February 2, 1962 to Mrs. Korn.............. | $ 2,000 |
| February 14, 1962 to Sol A. Rosenblatt....... | $25,000 |

The record also establishes Goldsmith was not a creditor of the Kaufmanns and unknown to them. In the subsequent "Amparo" proceeding by Mrs. Rosenstiel to vacate the Goldsmith decree, he did not appear. Instead, another, and possibly fictitious, Goldsmith purported to appear and did defend the "Amparo" proceeding through attorneys retained by respondent for and in behalf of his client.

Respondent's admitted intention was to withhold from Mrs. Rosenstiel and her attorneys knowledge of the Kaufmann decree until it was introduced in evidence in the New York suit.

Respondent was superseded by other attorneys during March, 1963. Thereafter his client sought an accounting relative to the disbursement of $410,000 allegedly disbursed by respondent in his behalf. Various explanations were given by respondent in the accounting proceeding and before the Committee on Grievances as to the circumstances surrounding the Goldsmith decree. At one time, respondent testified he had no knowledge of the Goldsmith decree until after its delivery in Mexico to his associate, Mae Korn, the latter part of February, 1962 and her return to New York on or about March 8 or 9, 1962. In the accounting proceeding, respondent's testimony is that he was mistaken in testifying he did not know of the Goldsmith decree until he received a copy of it.

The record clearly establishes that the respondent's client desperately desired to sever the bonds of matrimony with his fourth wife; that the annulment of her Mexican divorce decree from Kaufmann was advised by respondent and eagerly sought by his client; that the Goldsmith decree was to the advantage of the respondent's client alone and no other; and that the persons responsible or contributing to the Goldsmith decree were sought out and compensated by or with respondent's knowledge and consent, and include Mexican officials, to whom payments were covertly made because they were in the nature of bribes.

The unprofessional conduct of the respondent attending the defense of Mrs. Rosenstiel's "Amparo" proceeding is set forth in the *Per Curiam*.

I find no mitigating circumstances. Respondent knowingly embarked on a course of professional misconduct in compliance with the demands of his client. He was motivated solely

450

by monetary reward and his conduct evinces professional irresponsibility.

For these reasons, and on all the grounds stated in the report of the learned Referee, I vote to sustain the findings *in toto* and disbar the respondent. (*Matter of Farrell*, 27 A D 2d 61.)

EAGER, J. P., CAPOZZOLI, McGIVERN and MARKEWICH, JJ., concur in *Per Curiam* opinion; McNALLY, J., dissents in part in an opinion.

Respondent suspended from practice as an attorney and counselor at law in the State of New York for a period of three years, effective February 5, 1971.